Case number 12-2223, Joseph Stines v. United States of America. Good morning, Your Honors. I'd like to reserve three minutes of my time, please. You may. We've raised a Brady challenge here, and first I'd like to address the impact of the Jefferson decision by this Court, and then I will address the District Court's credibility determination at the evidentiary hearing that was held in Mr. Stines' case. This Court's decisions in the two Jefferson appeals resolved some of the issues presented here. Certainly the Court found that the hidden deals constituted Brady information, that the information was material under Brady, and that the delay in raising the claim was the fault of the prosecution. In other words, the delays were not attributable to these defendants. The further conclusion in Jefferson that he, Mr. Jefferson, could not establish prejudice does not control here, because the Stines case is distinguishable. In Stines, we don't simply have the evidence of the deals after the fact. We now have evidence of promises which occurred before the trial that the witnesses would be getting better deals. In the Stines case, all of the witnesses relied upon by the District Court in calculating drug quantity were tainted. In Stines, we don't just have incremental inducements or cumulativeness. We have suborn perjury. We have a lie about the drug quantity attributable to Mr. Stines. We have Mr. Warren knowingly, falsely escalating Mr. Stines' drug amounts at Mr. Convertino's urging. In addition, Mr. Warren explains... Stop right there for just a second, because that's where these issues sort of have to be conflated, it seems to me. I think you would have had a much better claim to distinguish Jefferson in this particular case, but for the fact that you had at least a partial evidentiary hearing where the judge weighs the credibility of Warren and finds he has no credibility is inherently incredible. So if you take that off the table, then how is it different from Jefferson? Well, I guess you want me to address the credibility assessment. I can do that now. Not really. I'm just saying we'll use it as a hypothetical. If you hypothetically take Warren off the table because of the credibility finding of the district judge in this case, then how is this case distinguishable from Jefferson's? Well, I think the school's memorandum indicates that we do have a lot more with respect to Mr. Stines than Mr. Jefferson had. Sorry, which memorandum? The school's memorandum. So that has been supplied to the court, and that was the investigation by the Justice Department, and they basically interviewed a lot of these witnesses, and we had in addition to... Okay, I just didn't have the name for it. I know what you're talking about now, the school's. So we had the school's memorandum, and in that case, you had Talley Alexander, and we had a hearing. We had Mr. Alexander come forward also, but Mr. Alexander also talks about promises before the effectuation of the deal after. We have a whole number of different witnesses who talked about that. Alexander is one of the same witnesses in this case and Jefferson, is he not? That's right. He testified a lot as to Mr. Stines. I don't know the extent to which... There were witnesses that you claim had deals in this case that were not in Jefferson, but you happen to be mentioning one that's in both cases. There were others, and they don't come to mind at the moment, but there were others in the school's memorandum that only testified against Mr. Stines. The testimony was that Mr. Stines was targeted as to all of these witnesses, and let me address credibility because I think that's an issue here. The judge's conclusion that Razul Warren is not credible is reviewable de novo because Judge Borman's analysis and his process was legally incorrect. In assessing credibility, he looked at Warren's evidentiary hearing testimony in a vacuum, and we contend that that's error. In Bagley at 473 U.S. at 675, in Kiles v. Whitley at 514 U.S. at 436, tainted evidence is considered collectively, not item by item. Sometimes the other evidence shows that the tainted evidence is not such a big deal. This case was just the opposite. Judge Borman's ostrich approach to Razul Warren's testimony ignores the synergy of all of this information combined. He ignored the fact of the deals themselves, which I think addresses the court's questions. He ignored the fact and pattern of the deals themselves. For 14 months, I personally scoured these witness files. In some cases, Mr. Convertino had even sealed the sealing orders. In Hans Thymus's file, for example, there was no trace whatsoever of the deals that would be visible to the public. He then scattered the cases to all sorts of different judges in violation of the court rule. The pervasiveness of this concealment was just stunning. Judge Borman ignores all of that. He ignored the school's memorandum, which I just talked about. It provides you with admissions by the witnesses. This is an initial thing. It shows the encouragement, the complicity of the government's attorneys, not just Mr. Convertino, Mr. Lange, the agents. When you say all of that goes to his finding that Warren is incredible because it would overcome his credibility of seeing him on the witness stand and so on? He ignored it. He only looked at Mr. Warren, and he doesn't even analyze the other witnesses. He doesn't talk about the school's memorandum at all. In addition, we think that his process is flawed. I'm sorry to interrupt. Why wouldn't you argue that that's just clear error as opposed to de novo review, that the error is so clear that it's manifest? I think it is also clear error. Our cases seem to suggest that that's the sort of finding that we would review on clear error, and I think you've now argued that we should be reviewing that determination de novo because you don't like the way in which Judge Borman has handled various aspects of the hearing. I think his findings were clearly erroneous. The reason why I say that it's also a legal error, and let me give you the United States v. Corey, for example, from the First Circuit, 570 F. 3rd. 373, where the district court is required to assess evidence to decide credibility, and he then abdicates that function. The standard isn't clear error anymore. You're not just looking at credibility at that point. You're looking at his process, his analysis. In this case, he didn't want to hear about the remainder of this case. This was a voluminous case. It had to do with all of these other witnesses, and he decided for whatever reason just to consider Roswell Warren, and we think that was an error of process. I understand your argument that the evidence you're hearing should have included other witnesses. He should have looked at all these other documents. I get that. But with respect to the decision of Judge Borman in connection with Warren, what he says is Warren is inherently incredible because of his reluctance to provide complete answers, and he characterized his testimony as replete with evasiveness. Well, that's exactly the kind of stuff that the person in the courtroom, the district judge, gets to do, and we're supposed to give deference to that. So I'm having trouble figuring out how we set aside, how we take these other things into account to say, gee, Warren should have been found to be incredible given that the basis is his actual performance in court. Here's how. We asked to put on the testimony of Mr. Convertino, the AUSA. In the Dyess case, for example, the court gave a broader hearing. They allowed the defendants to call the tainted witness. They allowed the defendants to attempt to call the prosecutor, and then he either asserted his right or not the prosecutor. In that case, it was the police officer. He either asserts his right or not. In this case, we don't know whether or not Mr. Convertino would have agreed that he said all these things to Russell Warren. So I don't know how you fairly and fully assess credibility. We don't even know what all Judge Borman thought was incredible. And in this case, I believe that all these things were said to Mr. Warren, that you can go home to see your son. Do you want to be there when he's 12? All these things were said, and I don't think that he could fairly assess even Mr. Warren's credibility without allowing us to call the agents, the officers, and the other witnesses without taking into account the deals themselves. What you call scouring the files in those documentary matters, were those in fact before Judge Borman in the sense that you filed them in argumentation or as exhibits or something of that sort? I did. This is what I did. First, I tried to move to unseal in Judge Borman's, and he said, those aren't my cases. You can't unseal in there. So then I went around judge by judge by judge. We didn't know how he could have done this until Mr. Thomas had killed somebody. We realized, well, he's not in anymore. He's not in custody anymore. He must be out killing people. So we had to figure out how that happened. We went to his judge, Judge Cohen, who we just talked about today. We went to his and unsealed it there, and then we decided to just try to unseal everything. In some cases, they weren't sealed, but they had been. So then you filed them, and then did you explicitly argue that these documents, in effect, overcome any credibility qualms you have because Warren must be telling the truth because of the documents? Yes, and he never addressed the documents at all. We submitted the documents. We attached them as files. We attached them as exhibits all the way through. So yes, all that is attached. In the Dyess case, and this I think is crucial, how do you find that there's no prejudice with respect to a Bagley violation? Judge Borman just took it upon himself to say, well, I don't believe him because of X or Y, and I don't think that that's the process by which a Bagley claim is assessed. I think he's looking more in the chambers lines of cases where you're looking at a recanting witness, for example. In this case, I think what the judge had to do was what they did in Dyess. In Dyess, they allowed the witnesses to be called. They allowed that confrontation to occur. The no prejudice finding in Dyess was understandable in that case because there was a second witness to the very same transaction who was not tainted. So therefore, you could throw out the tainted witness and still use that quantity. Our case is distinguishable. The judge used all of the quantities of all of these tainted witnesses. There are no clean backup witnesses to the tainted witnesses here. We have Ava Taylor. She's had something like 3 kilograms, large, large quantities. There's no backup to Ava Taylor. It's our position that what should have been done here and what should be done now is that a remand should happen and that we should be allowed to call all of these witnesses that were in the school's memorandum, all of the tainted witnesses, that we should be allowed to call Mr. Convertino. I don't believe at this point that any of them would have a viable Fifth Amendment privilege because we're too far beyond the statute of limitations in terms of what happened at trial, and let's see what happens. So I think that that's the proper thing. The judge chose to hear Warren only. Was there discussion about whether if he was only going to give you one witness, was Warren the one to start with? Did you want somebody else, or if he was only going to give you one? This is how it happened, as I understand it. According to him, I asked for everybody. I never waived it. All the way through I asked for everybody. He said because Warren was the only one that had admitted to perjury, according to us, that that's who he was going to call first. In fact, Julius Quincy had admitted to perjury at Mr. Convertino's urging in one of the first filed motions for new trial. So it wasn't just Mr. Quincy. Number two, there's no reason for just doing that. He shut the door right after I called and interrogated Razul Warren, and he didn't allow us to do any more in answer to the court's question. Okay. Thank you, counsel. You'll have your time for rebuttal. Good morning. May it please the court. Bruce Judge on behalf of the United States. If I could address first Ms. Danier's position that the district court made a decision on Mr. Warren in a vacuum, that is on Mr. Warren's credibility in a vacuum. I believe the record shows just the opposite. The district court carefully evaluated Mr. Warren's evidentiary hearing testimony and said it in careful detail against what had happened during the trial that had taken place before that same judge, before Judge Borman, and went through a series of evidentiary events, very specific events that involved taped phone calls, transcripts, pieces of evidence that had come in at the trial, and did an analysis finding that Warren's testimony that was being offered many years later was simply in complete contradiction with the evidence that had come in at the trial, and on that basis found that Warren was inherently incredible, not close to it. Your adversary seems to say that he should have put it in the context of these other activities by Convertino in this or similar events, so you're saying he did put it in context but only in the context of the trial that he had seen. Is that? Not just that, Your Honor. What else did he do? Well, he identified and specifically said that Warren was, quote, the one person, according to Steins, who admitted giving perjured testimony at Steins' trial, the one person out of 27 witnesses, the one. She seems to say that Ms. Quincy had also admitted to perjury. And I don't recall that being raised. Certainly I don't recall Mr. Quincy being raised, but these other individuals, Mr. Thomas, Mr. Alexander, Mr. Palmer, for instance, none of those individuals ever indicated that they had given any false testimony during trial. And again and again, these allegations keep getting repeated until somehow they take on as if they have evidentiary grounding in the record of this case. They do not. They do not. There are no affidavits from Alexander, from Warren, from Palmer, from any of these other witnesses indicating that they gave false testimony. And indeed, with respect to the information in the school's memorandum, and that was before the court during the pendency of this case, that was very much before the court during the pendency of the Jefferson appeal. And just to be clear, these two defendants were tried together, were indicted together, were tried together. When you say it was before him, that was the question I asked in the sense that she said she filed it. She says that it was before him, but he didn't address it in any way. Is that accurate? Did not address it in the school's memorandum, and that's sort of the things that were in that and Convertino's other bad acts. I don't believe it could be accurate, Your Honor, that during the course of a six-year 2255 proceeding before Judge Borman, we addressed the school's memorandum on numerous points at numerous status conferences. When the judge made a finding after an evidentiary hearing with the one witness who, according to Steins, had admitted to giving perjured testimony, he focused on Warren, that witness. But just to put it in larger context, the school's memorandum, the allegations in the school's memorandum, which were turned over to counsel for Steins and for his co-defendants in 2005, that was before the district court through the pendency of this matter and Mr. Jefferson's matter. It was before the panel that decided Mr. Jefferson had not made out a Brady claim. Counsel, as we examine the issue of credibility here and the determination that Mr. Warren was inherently incredible, does it make a difference at all that the government sought out Mr. Warren? It's not the typical co-conspirator recantation where the witness comes forward at some point of his own or her own volition and recants testimony. Here, the government sought him out. That would be a little bit different calculus in terms of how we examine, under clear error or de novo review, this finding of credibility. I don't believe so, Your Honor, but certainly that is unusual. There are parts of this case that are unusual as far as the events that attach to one of the two AUSAs, Mr. Convertino, in a separate case with separate witnesses in a separate trial that did not involve this defendant. And when those events took place and were brought to the attention of the Department of Justice and my office, yes, there was a searching, extensive investigation into other cases that Mr. Convertino had handled. And individuals were sought out and interviewed. The vast majority of those individuals said there was no variation whatsoever between their testimony and what they said at trial. But those materials, once they were in the hands of my office, were turned over to the defendants out of an abundance of caution. That's not a per se endorsement that individuals who trafficked drugs with Mr. Stines for many years and had been sent to prison for it, that their unsworn allegations merit consideration to the level that it sets aside a jury verdict reached after a seven-week trial. But yes, they were turned over. And yes, there are aspects of this case and Mr. Convertino's situation in a different case that are unusual. When you say they sought them out, this was in the sense of interviewing them as potentially creating doubt on past cases. Yes, Your Honor. Yes. And Mr. Warren was, in that sense, it seems like both sides would agree, he looked like he was the best witness on that side. Well, I suppose it might be said he was. At least right now you're saying he's the only one who admitted perjury. Your Honor, I'm quoting what Judge Borman found and which was not contested, which he is the one person that Stines had identified. These other individuals had somehow been turned around just because this case has been pending for so long that they admitted that they said something in a trial different from their actual sentencing. But the government filed extensive transcripts of each one of those witnesses who were cross-examined through lengthy cross-examinations. Each one of those individuals admitted having a deal with the government. Each one of them admitted that they were hoping for sentencing reductions. And when you actually look at the numbers, Mr. Palmer testified before the trial jury, I hope to get less than 60 months. The recommendation will be less than 60 months. He got less than 60 months. Mr. Warren said that he could go as low as five years. He got 72 months. Mr. Alexander said in front of the jury, in front of the trial jury, I hope to be back out on the street. And when asked, well, could that be in a matter of months, he said yes. And set against that record. What did he get? Mr. Alexander? Yes. Ten years, Your Honor. So set against that record. That's what then, even if these things are taken as true, even if these unsworn, unverified allegations by a handful of the 27 witnesses who testified at trial are considered true, it's incremental impeachment having to do with witnesses who presumably had already been challenged, extensively challenged before the trial jury. This may be outside the record and not particularly relevant, but Mr. Convertino was prosecuted and convicted. Is that correct? Your Honor, he was charged with obstruction of justice arising out of a different case. He was acquitted at trial. Thank you for the court. If there are no further questions, that concludes my presentation. Thank you. Thank you, Ms. Stanier. You have your three minutes for rebuttal. Just as a follow-up to Judge Cole's last question, he was acquitted. However, the dismissal of the terrorism indictment still stands, and that was based upon his misconduct. So there's been a finding of his misconduct. In terms of whether this was a de minimis, cumulative type Brady violation, there's a difference with a witness saying, I hope to get X. I hope to get 10 years. And his other testimony that the government is going to promise Y. Here, that was the lie. The government was going to promise a much lower sentence, and that's why it's different. This is incremental. And as to that, there were lies that are laid out in the school's memorandum in terms of those types of lies, what they really believed that they were going to get, what Mr. Convertino really, really promised them. He was asked a question in terms of whether or not the judge addressed the school's memorandum, and his answer was, we addressed it. In other words, Mr. Judge addressed it. The court did not address it. Yes, we were there for six years. He never addressed the allegations that we're talking about here. The school's investigation began when Tally Alexander said, where's my deal? But it gained momentum. Clearly, if you look at the timing, it gained momentum because I was moving to unseal these files. That's when they started investigating everyone else, and that's when these disclosures started to happen. One final note on the Brady Challenge. This hearing provided us with a rare, vivid layperson's expression of how this type of misconduct distorts the evidence. Rosalind Warren very clearly didn't want to talk about certain people, his other sources at this hearing, and you could say that that aspect of his testimony was maybe less than candid, but I think there's certain things that did ring true. Mr. Warren tells us that Mr. Convertino was God in the courtroom. I wasn't interested in being accurate or truthful. I just needed to keep him happy. I didn't remember these events. I was high back then. That rang true. I just said what I had to say to get home. Everybody was doing it. Promises were made to everybody. That's the problem with inducements like this. It distorts the truth. Thank you, Judge. Thank you, counsel. Case will be submitted. Ms. Stanier, we appreciate your taking this case under the Criminal Justice Act. It's a service to our system of justice, even though we know you're not being compensated at market rates. Case will be submitted. Clerk may call the last case.